USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/8/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                          :
UNITED STATES OF AMERICA,            :
                                                          :
                  -v-                        :
                                                          :       1:15-cr-00254-GHW
MARCOS MOTA,                            :
                                                          :     MEMORANDUM OPINION AND
                                Defendant.    :              ORDER
                                                          :
------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

       On January 29, 2015, a Westchester County police officer pulled over a commercial passenger van travelling along a route the officer knew to be used regularly to transport drugs from New York City to New England. The asserted reason for the stop was a broken tail light. During the stop, in addition to requesting the ID and registration of the driver, the officer opened the rear door of the van, the passenger door of the van, and demanded identification from all of the passengers of the van. Then, sparked by his observations of the defendant, the officer ordered all of the passengers out of the van, and searched the passenger compartment of the van. He found a brick of heroin inside a black plastic deli bag, stuffed under the seat of the van near the defendant. Because the Court finds that the defendant was illegally seized in violation of the Fourth Amendment before the officer discovered the narcotics, the Court is obligated to grant the defendant's motion to suppress the brick of heroin and his post-arrest statement to the police.

**I.      Procedural History**

       Mr. Mota was charged in a two-count indictment with possessing and distributing heroin, and conspiring to do the same. On August 10, 2015, he filed his motion to suppress, arguing that his Fourth Amendment rights were violated because the arresting officer had touched his bag "in an exploratory manner," *Bond v. United States*, 529 U.S. 334, 338-39 (2000), and that physically

manipulating his bag constituted a trespass, *United States v. Jones*, 132 S.Ct. 945 (2012). The Government filed its opposition to Mr. Mota's motion on September 24, 2015. In Mr. Mota's reply he raised a new argument, challenging the legality of the traffic stop based on facts discovered after the filing of his initial motion. The Court asked the Government to submit a sur-opposition on this issue, which it did on October 30, 2015. The Court held an evidentiary hearing on December 14, 2015.

## II.   Factual Findings

### A.  Background

The stop, seizure and arrest that are the basis of this motion were conducted by Westchester Police Officer Gutierrez, who is the only officer with firsthand knowledge of the events. Officer Gutierrez had significant experience with the Westchester County Police Department—by the date of the evidentiary hearing in this case, held 11 months after the defendant's arrest, he had been with the department for 10 years. Officer Gutierrez was assigned to the special operations division canine division of the police department, in which he handled a specially trained German shepherd. Officer Gutierrez also had significant experience with narcotics. In the course of his career, he has recovered and handled over one hundred bricks of heroin.

On January 29, 2015, Officer Gutierrez was on patrol along the Hutchinson River Parkway. The Hutchinson River Parkway runs roughly North by Northeast, from the Bronx in New York City, through Westchester County, to the New York-Connecticut border.[1] Officer Gutierrez knew that drug traffickers used that route to transport narcotics in commercial passenger vans—or livery vans. More specifically, he knew, or believed, that the drugs were sometimes transported in livery vans operated by Five Stars Express LLC ("Five Stars"). Five Stars runs several scheduled round trips a day between New York City and Lawrence, Massachusetts.

---

[1] The Court takes judicial notice of the location and route of the Hutchinson River Parkway to provide context for the narrative.

2

Officer Gutierrez chose a particular turn in the parkway as a vantage from which to observe passing vehicles. He chose his location because it was a good spot to see vehicles violating the traffic laws—a turn in which vehicles have difficulty maintaining their lane, where many vehicles exceed the posted 45 mph speed limit. From that vantage, Officer Gutierrez saw a livery van operated by Five Stars pass by. Officer Gutierrez pulled out behind the van. After Officer Gutierrez pulled out behind the van, he testified, the van slowed down, indicating to Officer Gutierrez that the driver had depressed the brakes on the van. Tr. 10 ("When I went behind the vehicle and the vehicle slowed down [ ], to me it indicated that he had pressed on his brakes in order to slow down.") At that point, Officer Gutierrez noticed that a tail light on the van was not working properly. Which light did not function, and how, is a critical factual dispute in this case, which the Court explores in greater depth below.

Officer Gutierrez signaled for the van to stop. The van drove forward some distance, passing the next exit, so, instead of pulling over to the right side of the road, it pulled onto the median that separated the highway. Traffic rushed past on both sides of the van. Officer Gutierrez parked his patrol car directly behind the van, exited his car, and approached the driver's side window of the van.

The van was a dark grey Ford Econoline 350 with tinted windows. It was relatively small, with a driver's seat and a passenger seat in the front of the van, and three or four rows for passengers. In addition to the driver's side door, the van had double doors at the back of the van, and a large door or doors on the van's right hand side, where passengers could enter and exit.

The driver of the van that day was Mr. Daniel Luna Contreras. Mr. Contreras testified at the evidentiary hearing in this matter, using the assistance of a Spanish-language interpreter, although he was able to answer some questions in heavily accented English. Officer Gutierrez asked Mr. Contreras for his driver's license and registration. He also requested the van's manifest, or

passenger list, which, according to Officer Gutierrez, drivers are required to keep to show where all passengers' names and the locations where they had been picked up and would be dropped off. It was Officer Gutierrez' practice to review the manifest of passenger vans that he pulled over—and then to ask for a driver's license or other identification from all passengers in the van to match the names of the passengers with the names on the van manifest.[2]

After Officer Gutierrez obtained the documents that he had requested from the van's driver, he returned to his patrol car. Either while in his car, or at some other time, but in any event before returning to the van, Officer Gutierrez—alone apart for his canine partner—called for back-up. He called a detective on the narcotics task force—Detective Garcia.

Officer Gutierrez then returned to the van. He did not ask for consent to open the van doors or to request identification from the passengers, but he proceeded to do so. He went first to the rear doors of the van and opened them. From that perspective, he could see the back of the rear row of seats and the carpeted floor of the van. The officer observed nothing unusual. He left the rear doors of the van open to the January air, and walked around to the right side passenger doors of the van.

Standing outside the passenger door of the van, Officer Gutierrez began to call the names of the passengers listed on the manifest. At the same time that he was calling out names, Officer Gutierrez was scanning the floor of the van—in his words "to see if the seats are securely fixated against the floor." Tr. 13:6-7. There were approximately five people in the van, including a woman in the front passenger seat of the van, and a child. But Officer Gutierrez' attention was drawn to the defendant, Mr. Mota, who was seated alone in the back row of the van. At first, according to

---

[2] Mr. Contreras, the van driver, testified that he was stopped by Officer Gutierrez again in March of 2015. During the March incident Officer Gutierrez again conducted a manifest inspection but did not write Mr. Contreras a ticket, or, evidently, discover any illegal substances. The Government, however, has not suggested that random investigative stops of livery vans and their passengers provide a legal foundation for the search at issue, and the Court will not address that question here since the only theory advanced by the Government is that the January 29, 2015 stop was a valid traffic stop based on reasonable suspicion of a traffic violation.

4

Officer Gutierrez, Mr. Mota was seated on the left side of the back row's continuous, bench-like seat.

Mr. Mota's movements in response to the officer's request for documentation appeared to the officer to be excessive. Rather than just reaching for his wallet for identification, Mr. Mota began to move from the left side of the back row seat to the right side of the row. Officer Gutierrez testified that Mr. Mota appeared to be nervous, looking straight ahead, and not making eye contact with the officer. According to Officer Gutierrez, he then saw Mr. Mota lean over, reaching toward the left wall of the van. The officer heard what sounded like the rustling of a paper or plastic bag and the sound of an object dropping to the floor of the van. After that, according to the officer, Mr. Mota moved further to the right side of the back row of the vehicle. The Court notes that Mr. Mota submitted an affidavit in support of his motion stating that he did not do any of those things, ECF No. 17-1, but for purposes of this motion, the Court largely credits Officer Gutierrez' description of his observations of the defendant in the back row of the van, with the exception of the sound that Officer Gutierrez testified that he heard, as discussed in more detail below.

By the time that he observed Mr. Mota in the back seat, Detective Garcia from the narcotics task force had arrived on the scene. Sparked by his observations of Mr. Mota, and the sound that he claims to have heard, Officer Gutierrez asked the passengers to exit the van and to step out onto the median between the two highways. Most of the passengers did exit the vehicle—with the exception of the woman in the front of the van, and the small child. At the point that they exited the vehicle, Officer Gutierrez confirmed under cross-examination examination that from his perspective, the passengers were not free to leave the area. Officer Gutierrez asked Detective Garcia to watch Mr. Mota while Officer Gutierrez checked the inside of the van.

Officer Gutierrez then entered the van and went to the back row where Mr. Mota had been seated. He observed a black plastic bag, tied closed with a knot, under the seat and pressed up

5

against the left side of the van in what Officer Gutierrez described as "a very tight spot." Tr. 30:2.[3] Officer Gutierrez was able to reach forward and grab one part of the bag with one hand. He pulled the bag out from under the seat with that hand, then took hold of the bag with his second hand as well. Within seconds of taking the bag into both hands, based on the weight of the bag, the shape, and the firmness of the object inside, Officer Gutierrez concluded that the bag contained a brick of narcotics. Officer Gutierrez then opened the bag, either tearing or ripping open a portion of the bag. Inside, he found a rectangular object wrapped in black electrical tape, which he recognized as a brick of narcotics. The officer later field-tested the brick; it tested positive for heroin. Mr. Mota was arrested and taken into custody. Before allowing the van to depart, Officer Gutierrez wrote the van driver a ticket for the broken tail light. At the time, as discussed more below, the officer advised Mr. Contreras that if the light was repaired, and he brought proof of the repair to the police, the fine would be dropped.

### B. The Broken Light

There are two particular issues of fact to which the Court must dedicate additional attention: First, what caused Officer Gutierrez to stop the van. And, second, although ultimately not relevant to the Court's disposition of this motion, whether a noise prompted him to ask the passengers to exit the van, and, if so, what that noise was.

As described above, Officer Gutierrez testified that the basis for his decision to pull the van over was a broken tail light. While the Court credits Officer Gutierrez' testimony that he observed a broken tail light on the van, the Court cannot conclude that the dysfunctional tail light was one of the rear side brake lights, as Officer Gutierrez testified during the hearing—instead, based on the

---

[3] At the evidentiary hearing, the Court observed that the black plastic bag containing the heroin, Government Exhibit 2, was closed with a knot. Despite this, Officer Gutierrez testified that he could not recall if the plastic bag was knotted, although he acknowledged that he was the only person who could have provided facts supporting the original complaint, which stated that the bag "was closed, although it was not knotted." Tr. 70-71; Opposition Br. 2; Habib Decl. Ex. F, ECF No. 17-6 ¶ 9(f); see also Habib Decl. Ex. G, DEA Report, ECF No. 17-7 ¶ 3 ("untied black plastic bag").

documentary evidence and the testimony of the two disinterested witnesses presented at the hearing, the Court concludes that the dysfunctional tail light was the center light above the two rear doors of the van.



*Defense Exhibit A, introduced at the evidentiary hearing, is a picture of the van stopped on January 29, 2015. The top light, which Mr. Mota contends was the broken light, has been circled by defense counsel. Officer Gutierrez testified that the bottom left light was broken.*

In his arrest report, Officer Gutierrez did not specify which light was broken, he wrote only that he observed a van with "*its* rear tail light broken." Habib Decl. Ex. B. ECF No. 17-2 (emphasis added). Similarly, in the original complaint filed in this case, the Government alleged that the officer had observed "a black livery van with a tail light out," and the Drug Enforcement Administration's report regarding this incident says that the van had "a broken tail light" without identifying which light. Habib Decl. Ex. F and G, ECF No. 17-6 and 17-7.

In his reply brief, Mr. Mota argued for the first time that the traffic stop was illegal because the broken brake light was the top center light—a light that is not required under New York law. In support of this argument, the defendant provided a declaration from Victor Suero, the mechanic who repaired the van, which stated that Mr. Suero had replaced the bulbs in the top center brake light following this traffic stop. Second Habib Decl. Ex. D, ECF No. 25-4. Before Mr. Mota raised

7

the issue, no document specified which tail light was the cause of the stop. Indeed, even throughout the briefing process for this motion to suppress, the Government was unable to take a position regarding which of the van's brake lights had been broken. See Gov. Sur-Opposition Br., ECF No. 29 at 2. Instead, the Government argued that if the officer had pulled the van over based on a dysfunctional top light, that the officer's decision was a reasonable mistake of law. The first time that Officer Gutierrez specified that the light at issue was the rear brake light was after briefing on the issue was completed—when the impact of that fact on the resolution of this motion was known.

During the evidentiary hearing, Mr. Contreras, the van driver, testified that when Officer Gutierrez wrote him the ticket for the broken brake light, he told him that the ticket was for a burnt out top center light. Mr. Contreras also testified that Officer Gutierrez told him that if Mr. Contreras had the light fixed and took the receipt to the police the ticket would be dropped. Mr. Contreras followed those instructions.[4]

Mr. Suero also testified at the hearing. According to his testimony, Mr. Contreras brought a Five Stars van to his shop at the end of January 2015. Mr. Suero replaced the burnt out light bulbs in the top center brake light. Mr. Suero further testified that the top light was the only light he repaired at that time. The Court credits the testimony of Mr. Suero, who has no established motive to testify falsely. The van driver testified that he did as Officer Gutierrez had suggested—taking the invoice for the repair completed by Mr. Suero to the police to have the fine dropped. The record demonstrates that the fine for the broken tail light was dropped based on the record of the repair implemented by Mr. Suero. *See* Third Habib Decl. Ex. A, ECF No. 32-1 (copies of traffic summons issued to Daniel L. Contreras on January 29, 2015, "Statement of Correction" pursuant to N.Y. Vehicle & Traffic Law § 376-1, and invoice from Suero Auto Repair dated January 30, 2015).

---

[4] At a suppression hearing, a court "may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667 (1980) (citing *United States v. Matlock*, 415 U.S. 164, 172-74 (1974); *Brinegar v. United States*, 338 U.S. 160, 172-74 (1949); Fed. R. Evid. 104(a), 1101(d)(1)).

Officer Gutierrez testified that he pulled the van over because he observed that the left brake light was not working properly. Tr. 9-11. Notably, Officer Gutierrez did not testify that the light did not function at all, instead he stated that "[b]oth taillights should illuminate at a similar amount of light; one of them was less than the other." Tr. 10-11. So, according to Officer Gutierrez' testimony at the evidentiary hearing, the basis for the stop was not a "broken" tail light, or a "tail light out," as described in the descriptions of the event provided prior to the evidentiary hearing. *See* Habib Decl. Ex. F and G, ECF No. 17-6 and 17-7. Rather, as posited at the hearing, the basis was a tail light with lesser illumination than its mate.[5]

On cross-examination, Officer Gutierrez testified that he did not recall observing the van's top center brake light and that he had "never taken a look at the top light of any motor vehicle" in any of the traffic stops he has conducted. Tr. 76-77.

The Court finds that the burnt out top tail light of the van, not the left brake light, was the cause of the stop. The Court was confronted with the testimony of two disinterested witnesses, Mr. Contreras and Mr. Suero, who each testified that the top light was broken. At the same time, none of the paperwork associated with Mr. Mota's arrest specifies which light triggered the stop. The specific testimony that the broken tail light was one of the lateral brake lights only came to light after the significance of that factual finding was brought to the fore through this motion. That testimony—that the light was "less" than its mate—is not entirely consistent with the Government's previous written descriptions of the "broken" light. As a result, the Court cannot credit Officer Gutierrez's recollection, eleven months after the fact and not previously recorded, that he pulled the van over because the left brake light was dimmer than the right. Instead, the Court credits the

---

[5] The Court recognizes that a dim brake light may constitute a traffic violation under New York law, which requires that such lights "display a red to amber light visible at least five hundred feet from the rear of the vehicle when the brake of such vehicle is applied." N.Y. Vehicle and Traffic Law, § 375(40)(b). Here, however, there was no evidence that the allegedly dim left brake light was not visible 500 feet behind the van. And, in any event, it is not relevant because the Court credits the testimony that it was a broken top center light, and not a dim left light, that caused the stop.

9

documented evidence and the testimony provided by two disinterested witnesses that the broken tail light that motivated the stop was the top center light above the rear doors.

### C. The Sound in the Van

As discussed above, Officer Gutierrez testified that his manifest inspection was interrupted when Mr. Mota's behavior attracted his attention, and that he asked all of the passengers to exit the van after he heard something drop on the floor. The defendant suggests that any such noise could not have raised Officer Gutierrez's suspicions because the officer could not have heard anything, given the traffic whizzing by on both sides of the median, and the carpeted floor of the van.

In his arrest report, Officer Gutierrez described the sound as a "distinct thump" that he suspected was "a weapon or contraband," while by the time of the evidentiary hearing he recalled a "loud clunk" that he feared was "possibly a handgun or some sort of weapon." *Compare* Habib Decl. Ex. B. ECF No. 17-2 *with* Tr. 15. He also testified that despite the fact that the floor of the van was carpeted, and that the van was in a median with highway traffic going past in either direction, he heard a "thump." Tr. 61. In contrast, the driver, Mr. Contreras, testified that it was "impossible" for him to hear "any noises from the interior of the van" because he was "stopped in the middle of two highways" with "the windows down" and "a lot of vehicles" passing by. Tr. 101.

Officer Gutierrez described the bag's location as a "very tight spot," and said that he had to reach for the bag and pull it out when he found it. Tr. 30, 65. Indeed, the location where the plastic bag was discovered—between the left side wall of the van and the bracket that holds the seat in place, as pictured below—does not appear to be somewhere the bag could have just fallen, or been dropped:



*Second Habib Decl. Ex. F, ECF No. 25-6.*

At the very least, under the Government's theory of the case, Mr. Mota would have had to nudge or push the bag into place under the seat after dropping it. This is consistent with Officer Gutierrez's testimony that he saw Mr. Mota lean and reach over toward the left wall of the van, which the Court credits for purposes of this motion.

      For purposes of this motion, the Court credits Officer Gutierrez's testimony that he heard *something* that, together with Mr. Mota's movements, prompted him to ask the passengers to exit the van. But the Court cannot credit the testimony that he heard a "loud clunk," consistent with the sound of a weapon being dropped to the floor. The Court draws this conclusion from the location of the bag, pressed into a "very tight" spot, by Mr. Mota, who Officer Gutierrez observed leaning over to place the bag—not dropping it from the seat. The distance from the top of the seat to the carpeted floor of the van was not great. The Court accepts that the attentive Officer Gutierrez

11

heard something while Mr. Mota leaned over to place the bag under the seat—the rustling of the plastic bag, or perhaps even a "distinctive thump" as the bag slid into place, as he stated in his arrest report. The Court does not, however, credit the testimony that the sound was a "loud clunk," consistent only with sound of a weapon. Nor does the Court credit Officer Gutierrez' testimony at the evidentiary hearing that his sole concern was that Mr. Mota was in possession of a weapon. The Court observes that in this regard, the officer's recollection of the sound over time has evolved to align more closely with the standard articulated by the Supreme Court in *Michigan v. Long*, which requires a police officer to have reasonable suspicion that a "suspect is dangerous and . . . may gain immediate control of weapons," before conducting a search of the passenger compartment of a vehicle. 463 U.S. 1032, 1049 (1983).[6]

### III.   Discussion

Mr. Mota argues that Officer Gutierrez illegally stopped the livery van, and consequently, evidence obtained as a result of the stop must be suppressed. Before considering the legality of the stop, the Court must first determine whether Mr. Mota was seized within the meaning of the Fourth Amendment, as only a passenger who is seized may challenge the constitutionality of a traffic stop. *See Brendlin v. California*, 551 U.S. 249, 251 (2007).

#### A.   Mr. Mota Was Seized

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

---

[6] Because the Court concludes that Mr. Mota was seized before Officer Gutierrez heard the sound and asked the passengers to exit the van, and consequently that Mr. Mota may challenge the traffic stop, the Court does not reach the issue whether Mr. Mota's reasonable expectation of privacy was violated. The Court notes, however, that a passenger in a livery van with four fellow passengers does not have the same expectation of privacy in the rear seat of the livery van that the private automobile owner in *Long* had in his vehicle, or even the expectation of privacy that passengers in taxicabs have occasionally been found to have by virtue of their ability to exclude others and determine the course of the taxicab for the duration of their ride. *See United States v. Bulluck*, 2010 WL 1948591, at *13-20 (S.D.N.Y. May 13, 2010) (collecting cases and concluding that taxicab passengers have no meaningful expectation of privacy in the cab), *rev'd on other grounds* 556 Fed.App'x 18 (2d Cir. 2014). Mr. Mota had no reasonable expectation of privacy in the passenger compartment of the van, so the relevant question, had there been occasion to reach it, would have been whether he had a reasonable expectation of privacy in the black plastic bag. *See Bulluck*, 556 Fed.App'x at 19.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement, 'through means intentionally applied.'" *Brendlin v. California*, 551 U.S. 249, 254 (2007). To determine whether a seizure has occurred, courts examine whether a reasonable person would have felt "free to leave," or, in circumstances when "a person 'has no desire to leave,' for reasons unrelated to the police presence," whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 255 (quoting *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991)). The "reasonable person" is presumed to be an innocent person. *Bostick*, 501 U.S. at 438.

It is well settled that during a traffic stop the driver of the vehicle is seized for purposes of the Fourth Amendment. *Brendlin*, 551 U.S. at 255. In *Brendlin v. California*, the Supreme Court applied the freedom to "terminate the encounter" test and held that passengers are also seized during traffic stops. *Id.* at 257-59. But the Court limited its holding to private vehicles in a footnote:

> [T]he relationship between driver and passenger is not the same in a common carrier as it is in a private vehicle, and the expectations of police officers and passengers differ accordingly. In those cases, as here, the crucial question would be whether a reasonable person in the passenger's position would feel free to take steps to terminate the encounter.

*Id.* at 262 n.6. Since *Brendlin*, the Supreme Court has not established categorically whether passengers in taxi cabs, livery vans, or buses are seized during traffic stops.

The Second Circuit has answered the question whether passengers in taxi cabs are seized during traffic stops in the affirmative. *Townes v. City of New York*, 176 F.3d 138, 144 (1999). But the Circuit has not yet had occasion to consider the effect of a stop on passengers in livery vans or buses. The only federal district court to consider the question with respect to commercial vans found that travel plans of van passengers were "curtailed" similarly to those of the passenger in *Brendlin*, and that, therefore, they were seized. *United States v. Pina-Lopez*, No. 6:12-cr-00267-AA,

2013 WL 867430, at *5 (D. Or. Mar. 8, 2013) (citing *Brendlin*, 551 U.S. at 255, 257).[7] Because no categorical rule exists with respect to passengers in commercial vans, the Court must consider whether a reasonable innocent person in Mr. Mota's specific circumstances would have felt free to decline Officer Gutierrez's request for identification or otherwise terminate this encounter. The Court concludes that they would not.[8]

First, a reasonable person would not have felt free to leave, and although that is not dispositive when a person's movement is restricted by other factors—such as being a passenger on a bus—it remains a relevant factor. *See Brendlin*, 551 U.S. at 257 (analyzing whether a passenger in a car would feel free to leave in applying the "terminate the encounter" test). "An officer who orders one particular car to pull over acts with an implicit claim of right based on fault of some sort, and a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing." *Id.* at 257. This is in contrast to "most cases involving drug interdiction efforts, [where] police officers typically approach or board buses at regularly-scheduled stops . . . ." *Pina-Lopez*, 2013 WL 867430, at *9. Here, in a situation in which the van was pulled over in the median with highway traffic passing on either side, and then each passenger's name was called out in turn, it would be unrealistic for a passenger to feel that he or she could leave.

Second, although the van was pulled over due to an asserted traffic violation, it was apparent from the beginning of the stop that Officer Gutierrez's interest was not limited to the driver or the

---

[7] The circumstances of the traffic stop here are akin to those in *Pina-Lopez*: a commercial van, owned by a company that served primarily Latino passengers on interstate routes, was pulled over for an alleged traffic violation by an officer who knew that illegal drugs had been found in that company's vans in the past. *See id.* at *1.

[8] While these studies did not affect the Court's decision in this case, the Court notes that recent legal scholarship has begun to call into question the judiciary's method of determining whether a person has been seized. *See* Alisa M. Smith, Erik Dolgoff & Dana Stewart Speer, *Testing Judicial Assumption of the "Consensual" Encounter: An Experimental Study*, 14 FLA. COSTAL L. REV. 285 (2013); David A. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J. CRIM. L. & CRIMINOLOGY 51 (2009). These articles posit that the limited empirical studies conducted to date suggest that the average person is less likely to feel free to leave or to terminate an encounter with police than our jurisprudence has generally assumed.

brake light, but that the passengers were also being investigated. At the same time that Officer Gutierrez requested Mr. Contreras's license and registration he also requested the manifest listing the passengers in the van. Shortly thereafter, he first opened the rear door of the van, where luggage could be stored, and scrutinized the floor of the van. He left the rear doors of the van open. Officer Gutierrez then approached the passenger-side door of the van, opened the door, again surveyed the floor of the van, and, standing in front of the passenger door, asked each of the passengers to produce identification. He observed their behavior with some care. A reasonable passenger would not have felt free to decline a uniformed police officer's request to produce identification, and to terminate the encounter, in this situation.

Third, the small number of passengers in this van—only five, as compared to a fifty on a bus for example—would have increased each person's feeling that he or she was "subject to suspicion" and "some scrutiny" simply by being present in the vehicle. *See Brendlin*, 551 U.S. at 257.

Fourth, Officer Gutierrez had called Detective Garcia to the scene prior to opening the passenger-side door and observing any of the passengers. Although Officer Gutierrez did not recall the exact moment when Detective Garcia arrived, he was present by the time Officer Gutierrez heard the noise and asked the passengers to exit the van. When an additional law enforcement officer arrived, a reasonable, innocent passenger's perception of his ability to terminate the encounter would have been reduced still further.

Based on the totality of the circumstances, the Court holds that Mr. Mota was (and the other passengers in the livery van were) seized for purposes of the Fourth Amendment when Officer Gutierrez pulled the livery van into the median of the highway and began his manifest inspection. Therefore, Mr. Mota may challenge the legality of the stop.

### B. Legality of the Traffic Stop

The Fourth Amendment permits a police officer to make brief investigative traffic stops if

he or she has reasonable suspicion of a traffic violation. *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009). "This objective inquiry disregards the officer's subjective motivation and asks instead whether a reasonable officer would suspect unlawful activity under the totality of the circumstances." *U.S. v. Diaz*, ---F.3d---, 2015 WL 5201508 at *4 (2d Cir. Sept. 8, 2015) (citing *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)). "In other words, an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance." *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1999).

Furthermore, the Supreme Court recently held in *Heien v. North Carolina*, that an investigatory stop does not run afoul of the Fourth Amendment when it is based on a reasonable mistake of law. 135 S. Ct. 530 (2014). In its decision, however, the Court stressed that "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or law—must be *objectively* reasonable." *Id.* at 539 (emphasis in original). This inquiry "is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." *Id.*

In *Heien*, the case turned on whether a misunderstanding of how many working brake lights were required by state law was objectively reasonable. *Id.* at 535. A police officer had pulled over the car in which Nicolas Heien was a passenger after noticing that its right brake light was broken, and the stop ultimately led to the discovery of cocaine in the car. *Id.* at 534. Mr. Heien appealed, arguing that the initial traffic stop was based on a mistake of law. The relevant provision of the North Carolina vehicle code required that a car be "equipped with a stop lamp on the rear of the vehicle" and permitted the single required stop lamp to be "incorporated into a unit with one or more other rear lamps." *Id.* at 535 (citing N.C. Gen. Stat. Ann. § 20-129(g)(2007)). The officer had stopped a car with one working brake light, when one was all that the law required. Another subsection of the same provision, however, required "all originally equipped rear lamps" to be "in

good working order." *Id.* at 540 (N.C. Gen. Stat. Ann. § 20-129(d)(2007)). The North Carolina Supreme Court concluded that the "rear lamps" referred to in subsection (d) do not include brake lights, but that it would have been reasonable for the officer to think they did. *Id.* The Supreme Court agreed, reasoning that the use of the word "other" in subsection (g) suggests that a "stop lamp" is a type of "rear lamp," and therefore the officer's mistake was objectively reasonable. *Id.*

The question before this Court is whether, under New York's vehicle code, it would have been objectively reasonable to conclude that the livery van was required to have three working brake lights when in fact it only needed to have two.[9] The New York vehicle code provides that:

> Every motor vehicle, except a motorcycle, operated or driven upon the public highways of the state, if manufactured on or after January first, nineteen hundred fifty-two, shall be equipped with at least **two stop lamps**, one on each side, each of which shall display a red to amber light visible at least five hundred feet from the rear of the vehicle when the brake of such vehicle is applied.

N.Y. Vehicle and Traffic Law, § 375(40)(b) (emphasis supplied). The Government argues that because "each of which" modifies "at least two stop lamps," it is reasonable to read the statute to require that "each" brake light on a vehicle display a red or amber light—even if the vehicle has more than two brake lights. This argument is unpersuasive. The Government has done its best to read ambiguity into the statute, but the plain meaning of the statute is evident and must prevail. *United States v. Santos*, 541 F.3d 63, 67 (2d Cir. 2008). The phrase "each of which" clearly signifies that each one of the two requisite brake lights on each side must display a red or amber light.

Additionally, since 1986 (for cars) and 1994 (for other vehicles, including passenger vans) the National Highway Traffic Safety Administration has required new vehicles to have center high mounted stop lamps. 49 C.F.R. § 571.108. The New York vehicle code has been amended on an almost annual basis since 1986, and the legislature has chosen not to change § 375(40) to require

---

[9] The Government does not claim that driving with a broken third brake light—the center high mounted stop lamp—is a traffic violation under New York law. It argues only that a traffic stop for a broken top center light would be a reasonable mistake of law.

17

three working brake lights, as the language of the statute makes clear. And, although not directly relevant to the "objectively reasonable" analysis under *Heien*, Officer Gutierrez's testimony at the evidentiary hearing—that he has "never taken a look at the top light" of any vehicle he has stopped—demonstrates that Officer Gutierrez did not have a subjective belief that the burnt out top brake light was a traffic violation. Tr. 76-77. At least one officer's subjective beliefs are consistent with the Court's conclusion that the mistake of law was not objectively reasonable.

Because a burnt out top center brake light is not a traffic violation under New York law, and it is not an objectively reasonable mistake of law to conclude otherwise, Officer Gutierrez's stop of the Five Stars van violated the Fourth Amendment.

### C. Application of the Exclusionary Rule

"To safeguard Fourth Amendment rights, the Supreme Court created 'an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) (quoting *Herring v. United States*, 555 U.S. 135, 139 (2009)). The exclusionary rule applies to evidence obtained directly, and indirectly, as a result of Fourth Amendment violations and encompasses "physical material . . . items observed or words overhead in the course of the unlawful activity . . . or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470 (1980). "In the typical 'fruit of the poisonous tree' case . . . the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *Id.* at 471.

Even when the causal chain is intact, exclusion is not an automatic remedy for all Fourth Amendment violations. The exclusionary rule is intended "to deter future Fourth Amendment violations" and "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . .

unwarranted.'" *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (citations omitted). The Supreme Court has articulated a number of exceptions to the exclusionary rule that apply when the illegal search or seizure at issue was carried out in "good faith." *See id.* at 2428. These include searches in which police officers relied on a warrant, statute, or judicial precedent that is later held to be invalid, or on erroneous information regarding an arrest warrant in databases maintained by judicial or police employees. *Id.* (collecting cases). The common thread uniting these exceptions is that it was not the officer conducting the search who erred, but another actor, such as the legislature. *Id.* at 2429 (citing *Herring*, 555 U.S. at 144).

On the facts before the Court, the heroin and Mota's statements must be suppressed. Both are the direct result of the illegal seizure and no circumstances creating a "good faith" exception to exclusion are present. Accordingly, the heroin that was seized from the van and Mota's inculpatory statements must be suppressed.

## IV. Conclusion

For the foregoing reasons, the motion to suppress is GRANTED. The Clerk of Court is directed to terminate the motion pending at docket number 16.

SO ORDERED.

Dated: January 8, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge